Case number 12-5411 Grossmont Hospital Corporation doing business at Sharp Grossmont Hospital at L Appellants v. Sylvia Mathews Burwell, Secretary, United States Department of Health and Human Services. Mr. Roth for the appellants, Ms. Foster for the appellee. Mr. Roth. Good morning, your honor. I reserved three minutes for rebuttal. May it please the court, Robert Roth, Hooper, Lundy, and Bookman for the appellant hospitals. The issue here is whether the secretary correctly decided that the Medicare copayments at issue were not actually collectible from California Medicaid when the hospitals claim them as worthless because the hospitals did not produce a California Medicaid liability determination which that agency had steadfastly refused to issue for more than 15 years. The secretary's final decision makes clear, however, that the sole purpose of the state determination requirement is, quote, to determine the state's liability and likewise the amount of coinsurance and deductible attributable to Medicare bad debt, close quote. Here the hospitals determine the Medicare bad debt using the same methodology that the secretary of the state had used for the larger universe of claims previously at issue. And the Medicare audit contractor stipulated that the hospitals, quote, supplied sufficient documentation to support their methodology, close quote. The provider reimbursement review board found that the secretary, quote, could easily determine the amounts to which the state is not obligated to pay, a finding the secretary's final determination and final decision did not dispute. The secretary has properly not disputed the hospital's determinations in this litigation because the record supports the accuracy. Thus the secretary's refusal to pay because of no state determination is pretextual, unsupported by the record, arbitrary and capricious, and must be reversed by this court as a clear violation of the statutory prohibition on crop subsidization. Are these claims for which California might be liable for some payment? Are they ones for which we know in advance California would not have any responsibility? There are certain claims that are in the listings that are that are in the joint appendix where there was a small amount on some of the claims. Yes, the state actually had some liability. And how many of the claims are from 1994? Do you have a percentage? I don't need an exact number, but... Well, there's approximately two million dollars at issue and 1994 represents 520,000 the entirety of 1994, calendar year 1994, your honor. But far more disturbing than the secretary's final decision and the refusal to pay is the criticism of the hospitals for not doing more to obtain the missing determinations, while the secretary at the same time hypocritically is refusing to require Medi-Cal, which is the California Medicaid program, to comply with applicable federal regulations that the secretary says are mandatory. When you sent a letter to Medi-Cal in what they missed, did you include... Yeah, they got the listing, the same listings that were presented in this case and that were appealed through the process, they were presented because they were grouped in months. There were months that were missing, not isolated claims here and there. So it's hard to know whether it was a processing failure on behalf of Medicaid or whether the claims never crossed over from Medicare. Your clients were aware that the Well, it depends what you mean, your honor, by the relevant time. There came a time when they realized that the secretary's crossover process that had been in place for decades wasn't working properly. When was that? When did they realize that? They realized that I think it was sometime in 98 and then they went about trying to get some of these claims submitted. But of course, the secretary's final determination makes clear that the determination is not based on the failure to bill, the failure to meet the must-build part of their policy. Do you dispute the failure to bill? I'm sorry? Do you dispute the failure to... I know the secretary said she wasn't going to rely on that, but do you dispute the failure to bill? Well, we don't know. We presume, as this court has presumed, the regularity of the secretary's especially a process of crossover that had been in place for decades. I think people knew that it wasn't working by, like you said, at least 1998, so I don't think you can presume regularity for claims arising then. Well, we knew that the claims were in process. That doesn't necessarily mean that the claims didn't cross over. It could have meant that they did cross over, but the Medicaid program, which at that time was issuing remittance advices that were incorrect, we don't know what happened within those processes. That's between the two of them, and they knew, but we do know that the secretary and the state most significantly entered into an agreement to reprocess all of these claims, and the claims that are at issue here are a subset of those claims. My understanding is that hospitals have, at least a number of hospitals, had figured out that there were gaps in the federal crossover process, and so that they were also submitting claims on their own as a backup. Were your clients not doing that, or were they doing that? I'm not aware of that reference in the record. Our clients, I think, were, yeah, so I'm not aware of that. The situation with the remittance advice, with the crossover claims, was that there came a point where there were conversations with the intermediary that was responsible for making these crossovers, and they said, yeah, there was some kind of a problem, and the secretary in the final decision here would only go as far as to say that some claims didn't cross over. So the secretary herself here didn't acknowledge or discuss a pervasive failure of these claims to cross over, did not attribute the decision to a lack of a reasonable collection effort. That distinguishes this case from Maine Medical and even from the community hospital case. I may be reading the wrong case. I thought the secretary's position, I understand you're viewing it differently, I thought the secretary's position, to give it as simply as I understand it, they've had a regulation in place for a long, long time. That regulation has been interpreted over the years, and there have been both circuit court and agency dispositions that have consistently said that in order for you to get what you want, you have to first bill the state agency, first bill the state Medicaid agency with bad debts, and then get a determination from them, and you haven't done that here, and you don't dispute that, and you're not suggesting that their interpretation of their regulation is somehow impermissible. I think you're short-circuiting the bad debt requirement. There are two components to it, not just the submission, but getting a determination, and that may be unfair, but it's never been challenged by anyone. It's been consistently applied. The Ninth Circuit ruled on it. The secretary's consistently ruled on it. This is a long-standing rule. It is not post-moratorium, as you argue. I went back and looked at those cases, so I'm not sure. You either complied with the rule that's properly interpreted or not. Well, the secretary clearly didn't comply with her own rules, Your Honor, because... No, no, no. My understanding of the record is you did not comply with the secretary's clear rules. We call attention of the court to Section 1102 of the Provider Reimbursement Manual, which was in effect while these claims were being processed, and while these claims were repealed back in 2000 and after, and that established conclusively that the secretary had an alternative determination policy. The secretary has pointed... That's not a policy that applies to you, because that's why I asked you. You said some of these claims involved ones where Medicaid owed a payment, and the Provider Reimbursement Manual provision only applies where the provider can establish that Medicaid is not responsible for payment. Right, and for most of these claims, for the lion's share of them, 90% of them, Medicaid has no responsibility at all, and for a small percentage of them, there is. But that interpretation, Your Honor, was rejected by the Ninth Circuit and the community hospital to try to argue that the language in 1102 somehow was limited to situations where there was no Medicaid payment at all. But the larger point here, Your Honor, Judge Edwards... What is... It's plain tech. I can't imagine anything plainer. Where the provider can establish that Medicaid is not responsible for payment, and that doesn't apply to all of your claims. I believe in the previous paragraph, it says in part or in full. I can get that language. I can get that language. JA-237. JA, what is it? 237 is what I have. JA-237. The first part, the first... I'm looking under column four, where it says, begins column four. It's just a general description. It says, any portion... Yeah, in the column four, in the... I think it's the third sentence. Any portion of the deductible co-insurance not paid by Medicaid under those criteria is deemed a Medicare bad debt. And so, Your Honor... That's got nothing to do with your ability to prove it by alternative means. That only shows up in the next paragraph as to things for which Medicaid is not responsible. But the Secretary herself used alternative means in the universe in this case, Your Honor. The Secretary did not rely on the... Did not require remittance advice for the universe of claims that was at issue because of the irregularities that were going on with the state Medicaid program in the 90s. My understanding is the Secretary's position is that the answer they got as part of the settlement was California's answer. That was its answer to those claims that were submitted to it. No, I understand that that was their answer, but the point I'm going to is the Secretary did not have a monolithic policy because the Secretary didn't follow that policy here. That if, in fact, that policy had been in place, the Secretary would have violated her own rules by the agreement. Didn't follow which policy? Sorry? Didn't follow which policy? Didn't follow the policy that a remittance advice was required for payment. That's what's laid out in JSM 370, which is the only place that the Secretary can point to where that policy was articulated. The Secretary settled the claims here without using a remittance advice. The Secretary used an alternative process that the hospitals themselves then followed that the Secretary's own contractor said was correct. So, so, Your Honor, there was never before... The settlement process had a mass amount of claims submitted to California and then California made payment on them. Why isn't that payment equivalent agreement? Because there's no dispute that these claims were excluded from that process that came to California Medicaid from the Medicare process and that were then determined using this alternative arrangement, not a remittance advice. And the Secretary, in fact, in her briefs here doesn't even talk about requiring remittance advice where that's what's in JSM 370. JSM 370 talks only in terms of a remittance advice, doesn't talk about any alternative, and in fact confirms in that, in that, in that JSM 370 to hold harmless states, excuse me, to hold harmless hospitals that in fact had relied on that, on that alternative documentation policy. Here, the alternative that the hospitals relied on was the exact policy, was the exact methodology that the Secretary had agreed to use with California Medicaid. The difference here is that, is that the Secretary didn't use her good offices to try to get the remittance advice here. What the Secretary is doing here is they're chastising the hospital for not having remittance advices under circumstances where the Secretary didn't lift a finger to get those when the Secretary, as she did in the agreement here, made sure that California in fact issued those. But under their interpretation of the regulation, the responsibility to get the remittance device is not on the Secretary. The responsibility to get the remittance devices is not on anybody because it wasn't articulated until, until JSM 370. We may disagree on the reading of the record as to what their interpretation. Okay. You persist in saying that the interpretation that they're relying on doesn't exist, and I went back through the record, including the Ninth Circuit's decision, as part of explanation for their decision, but decisions well before that, and everyone has said the policy's been in place a long time, and the burden has been on your clients, not the Secretary. Right, and the Ninth Circuit case was a documentation case where those were outpatient claims which didn't automatically cross over, and they were claims that arose before 1994. So there was pure dicta in that case, but more importantly... I'm talking about their other interpretations from the Secretary as well. The interpretations all from the Secretary were in these, were in these non-sealing cases, and they said you have to bill the state and get the money because we're not going to pay you. That's fine. We don't question that, but the mandatory state determination process that is at issue here, that isn't mentioned before the 2000 administrative decision, that... That's where I, I mean, I'll have to go back when you sit down and get the citations again, but I'm just reading the record differently. It occurred before 2000. We don't believe, Your Honor, that it was... I understand you don't believe that, and I don't understand it because everyone who's looked at it has said the policy was longstanding. It was never... The state determination policy does not exist before 2000, is not mentioned anywhere, but more importantly here, even if that policy existed and was firm law, the Secretary herself didn't follow it with the claims, with the universe of claims at issue here, because what the Secretary did with the universe of claims at issue here is didn't require remittance advice. When you look at that agreement, and when you look at what came out of it, the Secretary's decision or the Provider Reimbursement Review Board decision, it only talks about reports being made. There were no state determinations. If I could jump to a discrete question that hasn't been mentioned, in your allegations of error, if you would, you rely at least in part on the 1987 moratorium statute, the district court rule that you had not preserved that in the administrative proceedings. I read your brief is not a model of clarity on how you claim to have crossed that hurdle. Could you briefly tell me how it is that you think the district court was wrong in that analysis? Yes, Judge Gentile. The issue of the applicability of the moratorium didn't come up when this case was at the Provider Reimbursement Review Board, because like the community hospital case, it was a documentation case. What happens is the parties agreed, the Secretary's own audit contractor agreed that the documentation was sufficient to work under the methodology that had been used in the universe of claims. So the concern about the moratorium or the applicability of the state determination requirement simply didn't arise. So you didn't arise, that's another way of saying you didn't raise it, right? Of course, because it didn't come up until the Secretary issued her decision, and she mentioned the moratorium. So we're simply, we are simply now making argument about why that decision was arbitrary and capricious, Your Honor, because it raised for the- An argument you did not raise after the Secretary issued the opinion. You didn't, you did not in any fashion in the administrative proceedings raise the 1987. Once the Secretary issues her final decision, which was the first time the moratorium issue even came up, there is no opportunity to respond until we get to the court. But you certainly had an opportunity all along to make an argument that the Secretary's policy here itself violated the bad debt moratorium. Yes, Your Honor, absolutely. And you didn't do that. That's because, as we said, it was a documentation case. The Secretary's contractor didn't raise that as an issue. It wasn't something that was contested before the Provider Reimbursement Review Board, because the only question there was whether, in fact, the documentation was sufficient, which isn't contested. And under, and to the extent, there may have been some kind of longstanding regulation, which we don't think there was, and we don't even believe the Secretary is arguing it was a mandatory state determination process before a 1993 decision, that must yield to the cross-subsidization prohibition. In other words, there's no question, the Secretary hasn't disputed the amounts at issue here. If the Secretary doesn't pay these amounts, somebody's got to pay them. And what Congress said, the overarching basis for all of these- Your starting premise is, that must yield. That is a claim that the Secretary's interpretation is legally impermissible. You have not preserved that argument. On the moratorium? No, that the current interpretation, the one that I'm reading, is a 1993, hospital, the area, the Carolina. There are a number of citations where the Secretary said this over and over again. I'm just perplexed at your argument. And if you're claiming that their interpretation of their regulation is impermissible, that's a separate challenge. Oh, absolutely, Your Honor. The 1993, the Carolina PRRB, the administrative decision that you make reference to, was a non-sealing case. That had nothing to do with the situation where there was some money owed by the state Medicaid program. There was none. And it stands for the unremarkable proposition that Medicare isn't going to pay when Medicaid is responsible. We agree with that 100%. And that's been in place forever, and it should be in place forever. Our point here is more subtle than that, which goes to the state determination, which the lower court didn't address at all. It merged it both into the mandatory state determination and bus bill together. But as the First Circuit said in Maine Medical, those are really very separate policies with very separate pedigrees. No, I think as I'm reading this case law respectfully, they look part of the entire policy which interprets the original regulation. They go hand in hand. Well, except the mandatory state determination policy doesn't come up anywhere because what the Secretary was saying in these non-sealing cases was, don't bill us, bill Medicaid, because they're on the hook. It was not until the 2000 adjudicated decision that there came a non-sealing case where there's actually some liability. So before 2000, the factual predicate that stands here never arose. And what the Secretary's interpretive rules said back then, going back to long before 1987, is that the hospitals make the determination. They determine if anyone else was liable. And in fact, they can use an alternative determination, alternative documentation, which was explicitly put in the provider reimbursement manual. And it wasn't until after the Ninth Circuit issued its decision in community hospital that the Secretary said, oh, well, maybe that wasn't right. But there was no question  Yeah, I mean, that was inconsistent with their prior interpretation of the regulation. So they had to go back to the prior — the longstanding prior interpretation. Except it was pure dicta in that case. And the fact that — But the Secretary then followed and went back to the longstanding interpretation of the regulation. The record reflects, Your Honor, that in JSM 370, when they went back, they said, to the extent any hospital has relied on the previous alternative documentation policy, we will recognize it. That's what happened here, because when the state of California and the Secretary entered into an agreement to reprocess these claims and deal with these claims, they did it under an alternative theory. There was never any remittance advice. This was precisely why there was the hold harmless and why the Secretary, knowing the reliance of these particular hospitals and others around the country, said, no, this is not a wooden rule. This is not somehow, as the Secretary now argues, void ab initio. Not at all. It was a consistent expression of the alternative documentation policy that had been in place forever and had never come up because all of these adjudications that the Secretary referred to were situations where the Medicaid program owed 100 percent of the amount and Medicare owed zero. Now, can, so I know you make a lot of this ceiling, non-ceiling distinction, but I'm having trouble figuring out why that should make a difference, even if, whether they owe 100 percent or, and some they'll owe something, some they'll owe none, why the Secretary still wouldn't want to have the hospitals and the states sorted out in the first place? Oh, absolutely, Your Honor. We think that that is a correct and good policy when states are compliant. There are regulations that require the issuance of remittance advices. In California, they first of all would issue remittance advices for zero amounts that the Secretary's own lawyers said that the Medicare program had to ignore because they were incorrect. So the remittance advices being issued by California were themselves suspect. I just want to be clear then, so this prior, pre-existing policy of requiring a remittance advice, you don't challenge that it sensibly applies both to ceiling and non-ceiling cases? Put it, put aside the California Just Stops Paying example. No, no, the, the, whatever general rule there might have been, the Secretary allowed alternatives until 2000. It was the first time the Secretary articulated that somehow a remittance advice is mandatory. Where's the regulatory interpretation pre-2000 that says you can use an alternative to their stated rule? It's in PRM 1102, Judge Edwards. That's where it explicitly says that to the extent there is liability on somebody other than the Medicare, excuse me, than Medicaid, you can use whatever documentation you, you seem fit. And it's in cases where there is, where the, where the, where the Medicaid is responsible for all of the Medicare copayment amount or only a part of that copayment amount. And importantly, not only is that consistent with what's in 1102, which was vetted by the General Counsel's Office of HHS at the least, but it's consistent with what the Secretary did here in entering into an agreement with California Medicaid that called for payment on the basis of reports, not remittance advices. There isn't a shred of evidence anywhere in this record that the Secretary ever required remittance advices. And that is what's in the JSM 370 that the government now relies on as being the clear statement. But even her briefs mentioned state determinations and don't rely on a state remittance advice. Isn't part of your assertion here that the state still owes some on some of these claims? Absolutely. They've made clear. No, no, not, not at all, Your Honor. We don't have any right to go after them because there's a six month requirement of timely filing for these claims to go over. Once those six months haven't been met, which they weren't met because of the crossover claim process here, we were powerless. We couldn't bring a state mandamus action or something like that. We needed the Secretary to weigh in on this. The state, as I'm trying to make sure I understand it, the state made mistakes in their calculations. You got stuck with them and then it was too late to challenge them. Is that what you're saying to me? It was too late to force them to issue a remittance advice. And what the Secretary's bad... Wait, finish your sentence. You sound like me. That's an honor, Your Honor. That's the highest compliment I think I've ever been paid. You might note that as slow as I talk, it's probably how slow I listen if you take a breath every now and then. You need to finish that sentence. So I'm trying to make sure I have the picture straight in my head. There was this huge problem, an agreement to was not accurate, screwed up the calculation, and then they wouldn't hear any more from you. Is that right? That the state paid correctly on the basis of the claims that they adjudicated, but they missed a bunch of claims. Well, they didn't cover all of what... That's correct. In your view, they messed up. They messed up. All right. So now you cannot go back to the state, you're saying, because of a time limitation? Correct, Your Honor. And even if we were to go back to the state, this is where we get to the default position here of the capriciousness of the secretary from a substantial evidence perspective, is that there's no question that the amounts that we're seeking here are owed only from Medicare. There are some minor Medicaid amounts that... I understand that that may be right. I'm just trying to understand this picture because part of what I thought they were saying was that may or may not be true, but we have a even though it looks patently absurd to you, and you have to go back and get the remittances. That's correct, Your Honor. And we identified the six-month time limit that exists for timely filing, and it was in fact raised, Judge Santel, in the position paper that was filed before the Provider Reimbursement Review Board. That point was made, that was preserved, that's been a part of this case. The secretary has never challenged it, never refuted it, never questioned it, says kind of glibly and in a conclusory manner that the hospitals could have done more, but there's nothing more that the hospitals could have done. They never articulated what it was and what our legal basis would be. But more importantly, Your Honor, is that the requirement here is a reasonable collection effort. The hospital is not required to bankrupt itself by trying to chase down every one of these claims, and a reasonable collection effort is defined, Your Honor, as what would be required of a non-Medicare patient. So in other words, what the rules require here is that the hospitals treat Medicare and non-Medicare the same, so they're not dumping these bad debt requirements onto the Medicare program. Well, here that's not an issue because we know the determinations are correct, but moreover, the requirement is reasonable, and there's no question that what the hospitals did here acted reasonably in pursuing this as much as they can for 15 years trying to get these remittance advice. What's unreasonable is the secretary's failure to engage the way she did in 1999 and enter into some kind of a settlement with the state so they would issue these remittance advices, and then we don't have to clog up the case. This case should never have been brought because the secretary says that her regulations were mandatory and could have put pressure, as she did in 1999, on the state to issue these remittance advices, but failed to do it in a way that we think is a self-serving nonfeasance, because what happens if we don't get the remittance advices? Then Medicare doesn't have to pay. The secretary should have done that, should have engaged here, because this is a situation, no matter how you look at these regulations, no matter what regulation you think is in place, that there was never a discussion about what would happen if the remittance advice weren't issued. They assumed that states would comply with their legal requirements and issue remittance advices. All right. Thank you, Mr. Roth. Thank you. May it please the court, Sydney Foster for the government. Your honors, under certain limited circumstances, Medicare will reimburse providers of health care services for... Would you, early on, answer what counsel posited, that the secretary is saying that the hospitals did not do enough, but that they can't tell what more it is they should have done? How would you answer that proposition? Sure. I'd love to address that. The secretary here found that it was within the control of Medicaid, but that they failed to do so. What happened here is that starting in 1994, the automated crossover system apparently was having some problems, and that some of the claims did not reach the Medicaid agency. What plaintiffs should have done at that point, but waited three years to do, was to implement a system to catch those claims, to identify the claims that were not automatically crossing over, and then to directly bill those claims to the state. They did implement a system like that in 1997, and then they found that that system was effective, because the amount that they say is allegedly missing from the 1999 lump sum payments... The thing, the act that the secretary would say the hospital should have done, was send a bill directly to the Medicaid, and they did not do so. Is that... That is correct. That is what they should have done. They didn't submit to Medicaid? I'm sorry, what's that? They didn't submit to Medicaid? What was the settlement all about then? So the settlement addressed any claims that were already in Medicaid's system, so those would be claims that had crossed over through the automated crossover system, or claims that had been directly billed to the Medicaid system, but it wouldn't include claims that the Medicaid system had never received, and the secretary found that the claims that are at issue in this lawsuit are claims that the Medicaid system never received. They didn't make it through in the automated crossover system, and they didn't make it through with the direct billing. So there was a finding here that these claims were never received, and I'd like to address... When precisely were they on notice that the crossover process had failed, as to these claims? Well, I mean, I think it's their response... The crossover system, it's their responsibility to ensure that the crossover system is working properly. When they get remittance advices back from the state, they're their claims. It's the responsibility of the providers to make sure that those remittance advices are properly reflecting the claims that were submitted. They have all the information in front of them as to whether or not the number of claims that they're getting remittance advices on... Well, does everything usually go smoothly, so that if you got remittance advices for April and May and nothing for June, you'd be on notice that, hmm, those June things never made it there? Or were they reasonably relying on your crossover system to get things there and didn't know until it was too late that they weren't there? Initially, I'll note that I think that they actually claim in this 1999 letter to the state that they wrote, which, by the way, there's no evidence in the record that any of the claims were attached to that. That's a new argument that we're hearing for the first time in argument. But I think in that letter, they say that there were whole months that were missing from some of the 1994 claims. So you might... It would seem reasonable to me that you might think that that would have alerted them to the fact that there was a problem. But it is... How long did they have to cure that in if they wanted to take action based on that notice or information? How long did they have to cure that in? Everybody seems to agree it's not timely now. When did it cease to be timely? Right. So the governing regulation is that 51008, it does provide a general six-month limitation. But if you look at it, there's an exception for good cause when circumstances are out of the control of the provider. And it refers you to a different section, which is 51008.5. Every section refers to another section. Exactly. Right. So in that section, there is an exception for if you first submit your claims to Medicare, which is what would seem to be applicable here. I think that's point two of this, or subparagraph two of the section, and says that in those cases, then there's a year between kind of the date of discharge and the date that Medicaid requires the payment. There's also an exception, I think it's subparagraph five, for other special circumstances that are beyond the control of a provider. I don't know how that would apply here. I don't think we've mitigated on the basis of the exception, have we? I mean, they're operating in real life on the basis of the regulation. The exception's going to be backward-looking. The exception, I'm sorry, but? When you're talking about what they needed to do, I'm not sure how they could have the advantage of an exception that is inherently backward-looking. We couldn't say there was a special circumstance until they've already gotten out of time. So when we're talking about what they should have done, would we be talking about six months? Well, as I read the regulation, they had at least a year from the date of discharge to submit under that subparagraph two. I still think that they could potentially have at least asked to take advantage of the special circumstances. But I think at the end of the day, look, the Secretary found that it was within their control, and that's supported by substantial evidence. And part of why we know that it was within their control is that in 1997, they were able to implement a system where they were able to catch these claims that weren't crossing over and directly bill them to the state. That suggests that they had enough time under whatever provisions were applicable to do this. And there's also testimony in the record by their representative. He testified that he thought that the time limit in question was 60 days, which is now not the timeline that the plaintiffs are saying is applicable. Is there any doubt about the viability of the disputed claims now? As to whether or not the payment is required for them? Whether or not the Fed should be paying. There is a dispute. Right now, without a state determination of payment responsibility, we don't know exactly how much... But the states have already refused. So I think you're right. No, actually, I don't think there are any refusals. That's just the problem here. There are no state determinations here. The claim... What about the settlement process? You're saying that everything that was part of the settlement process had previously had a state determination? Right. The settlement process covered claims that were already in Medicaid systems. So they would have been claims that Medicaid had previously processed, but erroneously processed. Right. Didn't the petitioners interact with the states with respect to the matters that are still in dispute and the state said washed its hands of those? The only thing that... So the Secretary found that these particular claims were never submitted to the state. No, but didn't... Don't use technical words, okay? Let's talk at a real low level. Didn't they say to the states, but wait, in your calculation, there are these other claims which you haven't accounted for? This is my picture of it. And the state effectively said, no, go away. So in 1999, after they received the lump sum payments, they did send a letter to the state with just kind of a vague request for help. Don't characterize it. They sent a request. They called the state out on these other matters, right? That's correct in the letter. They called them out and the state effectively said by action and inaction, go away. No. Yes, that's correct. So the picture I have had, which is very perplexing for me, and you can put all the section numbers around it to try and make an argument because it seems completely bizarre to me. They effectively said, as soon as the state made the determination, there are these other claims as well that you have to account for. So they put them on notice and the state said, it's like a determination. The state said, no, go away. You folks know that. And they're saying, what more do you want to know? Well, that's to the extent you're suggesting that the absence of a response to the letter or responses in a phone call count as a state determination. But do you seriously doubt that the state has said, go away? We're not paying them. No, absolutely not. But we know that. Know what? You don't doubt that, right? I don't. Right. Okay. So the feds know the state have effectively determined we're not paying these. Now, what more are they supposed to do? It has to be on an official piece of paper? No, under the must-build policy, states are required to issue a determination, but it also has to be a proper determination where they're actually determining the amount. But if the state is saying to the petitioners, we're not going to do it. We're just telling you no. What are they supposed to do? What are they supposed to do? That's what I thought this was about. And I want to make sure I was understanding. So this is a very bizarre case. I don't know what else you're supposed to do. Everybody knows that the state has told them, that the state knows there are these additional claims, and the state has said, we will not pay them. And you know that, and they know that, and they're pulling their hair out wondering what else do you want us to do? The state will not pay us. Your Honor, I mean, the fundamental problem here is that the claims were not submitted in that 1994 to 1998 period. Had they been submitted during that period when they had enough time to do so, then they would have been covered by the lump sum payment. That's not what the state has said, as far as I know. Well, that's what the Secretary found, was that these claims have not been submitted to the state, and that's supported by the substantial evidence in the record that I was referencing. At 1999, in 1999, was there something else? You're justifying the state's refusal to consider on grounds that they came too late to the state. States, states definitely can reasonably refuse to... And I'm not saying they can't, I'm saying that, but is that what the state said, it was untimely? Well, the state didn't issue an answer to the letter. There was only a response in the phone call. The phone calls... I think the confusion here might be about the they. And my understanding is that there was just a general letter in 1999 that said, we've got a problem, things were missed, will you help us with it? But they didn't actually submit claims, so that California could look and say, that person wasn't Medicaid eligible. It's not only untimely, that person wasn't Medicaid eligible, there just was never an actual submission of individual claims that are now being submitted to you for payment. There was simply a general letter saying, we've got a problem, and we'll have to resolve the...  The letter, their 1999 letter is JA 203 to 204. Thank you very much. And that's, no, that's exactly right. The first time that the plaintiff... What was the citation? The claims, you say, have never been submitted and they say they were attached. That's exactly right. What was the citation? It's JA 203, 204. Letter doesn't indicate attachment. Okay. And so your understanding is that all California got was this letter and they said, we're done with this, we know there was nothing in the system, so it certainly wasn't submitted to the system that way. Right. And so what California said no to was not claims specific, it was no to this letter. That's correct. That's correct. And the vague request in the phone calls. It wasn't until 2006, which was seven years after the 1999 lump sum payments, that the plaintiffs first actually submitted the claims that are at issue here to the state. The state at that point did respond and said that it was untimely. And then the ordinary course, so put aside this whole California shenanigans, if a provider is just untimely in sending in a claim to the state and the state says, we're not going to pay, that's untimely, does the secretary then pay to prevent cross-subsidization, or is that just on the providers for being late? That's then on the providers. A state determination about the amounts that's based on a properly submitted claim is what's required. Obviously, if the opposite were the policy, then that would provide providers with no incentive to ever bill the state. They can say, whoops, it was too late, and then the secretary just becomes responsible for everything. It's just not reasonable collection efforts if they don't do it on time, so it doesn't qualify as bad debt that you would reimburse. That's correct. That's correct. The court has no... So what would you do if the state, when you say you've got this sort of two thing, you must bill and the state must answer? What if the state just categorically refused to answer? The hospitals can't make... They can submit the bills, but they can't make them answer. Could there be an exception? I know you say that isn't this case, but could there be an exception or is the secretary's rule absolutely hard and fast no matter what? Yeah, I mean, that isn't this case, and so there's no need for the court to address it. There's a need for you to address it. Right, and I will, don't worry. But it is a hard and fast rule, and it's reasonable for the reasons that we've explained in our brief. I mean, as an initial matter, states are legally obligated to issue these determinations. These claims don't actually come up that much because states generally fulfill that obligation. Well and good to say it's not going to come up, but we're hypothesizing. We get to do that. And it seems that you're requiring the providers to be responsible for something they can't control when you say it's a hard and fast rule that they have to have the state response. If the state just doesn't do it, they're out of the picture. They can't do anything. Providers have a number of means to try and obtain the state determination. They can, the first step is to actually submit the bills, which didn't happen here, and then there's following. We're assuming they've submitted a bill, and the state Medicaid agency has just not responded. They just don't do anything, which is sort of what they say is happening here. But even if you think that they submitted the bills, they're- Never mind what they did or didn't do in this case. Right. We're asking now if it is the case that the provider has submitted to the Medicaid agency, Medicaid has not responded, state has not responded. Secretary says, well, go away, you don't have a response from the Medicaid. What are they supposed to do? I want to answer that, but I just want to resist the characterization that all that the private provider needs to do is submit the bills. I mean, a follow-up would be appropriate. If the state says no, they can say, you know, it's untimely. They can say, no, actually we submitted- But if the state doesn't respond- Yes. They're out in the woods somewhere. They can't do anything about it, and the secretary is not going to give them any relief because of what the state failed to do. Is that right? That is right. And the reason that makes that the policy is reasonable, even in those circumstances, which, by the way, they would also have administrative and potentially judicial remedies- Do like Judge Edwards advised a while ago, go to the answer to the question without chasing the rabbits down the trail. Okay, I just want- Okay, absolutely. So it's reasonable because states are legally required to do so. And it serves many important functions. And this is critical. States have the most accurate information about- I'm sure it's a good idea to get it from the state. But what we're trying to ask you about is what can a provider do if the state doesn't follow its duty? And again, it's not presented, but it is the hard and fast rule that a state determination- That's not at all what I'm asking you, is it? I thought you had a question. What else can a provider do? We're just curious. What can they do if the state says, no, we hear you saying, they're obliged to do it, but suppose they don't? Well, I've been trying to describe what they can do to seek the determination from the state. And I- You told us all of that. Right. Okay. If they do what they're supposed to do- And if the state doesn't do it- Then it is their responsibility. That is the policy. They can't do anything about it, but they're responsible for it. They can't do anything other than- You're from the government. You're there to help them. That's right. That's right. I mean, sometimes- I would have thought your answer would be do what they did here, which is file a lawsuit against California. Or against the state and compel them to do it. Right. And then you apparently got involved and did this whole settlement with them. That's right. I mean, and so my major point, which I think the court is resisting a bit, is that they have many things that they can do to get the determinations from the state. We're not really trying to understand it. This case does not come across clearly, believe me. Let me ask you one other thing. I'm trying to anticipate what counsel is going to say when he gets up for rebuttal. I think part of what he's going to say is that you didn't follow this claimed procedure in handling the bunch of claims that were part of the settlement. And so how do you make exception there and not here? Well, I think- They didn't follow that course. They didn't follow the course of the rule that you say is hard and fast. And if they don't go through that, too bad. I think plaintiffs are characterizing the Musville policy narrowly to require actual documents from the state called remittance advices. That's not part of the Musville policy. The Musville policy requires determinations from the state as to their payment responsibility. It doesn't matter what is at the top of that document, whether it says remittance advice or is it some other form. When the lump sum payments were issued here, they were based on the state going through, looking at all of the prior claims that had been submitted to it, billed to it through either the crossover process or direct billing. They looked at them. They made determinations as to their payment responsibility. And they put those in a document and they sent them to Medicare. And those were the basis for those lump sum payments. So those lump sum payments were based on state determinations. That's what the Musville policy requires. There was no deviation from that in this particular case. Let me just ask you one quick procedural question. When there was an appeal here to the administrator procedurally, and the intermediary and secretary submitted comments or briefs or letters or whatever they were called as part of that process, did the hospital see those and do you exchange those like briefs or are they confidential communications between each party and the administrator? No, I'm 99% sure that they are, that the hospitals would have received, at least the intermediaries, I'm pretty sure the others. I can't recall with certainty, but I think they have CCs on them. That's why I think that's my memory, but I'm not sure. Thank you. Thank you. All right, Mr. Roth, you used up all your time, but we'll give you two minutes for rebuttal. My first question to you is where in the record does it show that actual claims were attached to the 1999 letter? I don't believe the claims were attached to those letters. That was an invitation to the state. It was giving them notice that claims were missing, months were missing, and made reference in any attachment to, because it says there was something attached in that paragraph. But I don't believe they were submitted at that time. Obviously, between now and then, each and every one of those claims was presented at least to the secretary, but I believe also to the Medicaid program as well, but they had a flat refusal. Hold on. So just to be clear, do we know whether these have actually all been submitted and do all these individual claims have ever been submitted to California, to the Medi-Cal system, as opposed to the secretary? I don't believe they've been for adjudication by the state. I can't tell you definitively whether they have or they haven't, because the state had said, don't bother us, we're not going to do anything with them, go to Medicare. But that's after you missed the deadline. After the secretary missed the deadline. No, after you missed the deadline. You did not submit, timely submit the claims to the state initially. The state... In fact, you didn't submit them at all. There is, of course not, because the crossover claim was in process. There has never been a case that is held that the crossover, that the SEC, that I know of, that hospitals cannot rely on the crossover claim process. What the hospitals did here is there was some diligence, but even that wasn't perfect, because there's still payments from 97 and 98 that weren't made. And if you go to page... I do want to be clear, though, why, as they say, by 97 you had a system in place to cover the sort of backup billing, I guess, because the crossover system you realized wasn't perfect. So if you had the system in place by 97, you must have realized sometime before 1997 that crossover billing wasn't worked. So why was it working so wasn't reliable and that you needed to have a backup system? So why, at a bare minimum, wouldn't your claims from, say, 96 on be barred? You can't rely on... You knew you couldn't rely on a secretary's submission. A fair question, Judge Millett. And to respond, I need to use a few seconds. I know that I don't have any time left. But what happened here, you need to... This is a one-off case. This is not going to affect any other providers around the country. This was California Medicaid from 94 to 98. And the cases that you allude to, Your Honor, were brought to compel not payment of Medicare bad debt, but to compel payment under the Medicaid program based on an interpretation of the law. Having Medicaid payment, not Medicare bad debt. And so what was going on back then, you really need to put this in context, is that the state began in May 1, 1994, issuing remittance advices that were incorrect. They were stating that there was no state liability based on a state plan that had not been accepted by CMS. And so what happened is CMS instructed its contractors to ignore Medicaid remittance advice from California. When that occurred, it affected hospitals themselves as far as the Medicaid reviewing their remittance advice is concerned, number one.  It is not unusual for Medicaid remittance advices not to be issued for several years down the road as the Medicaid agency is figuring out what's going on. So what happened is, before May 1, 1994, the hospital was going along, and before May 1, 1994, Your Honor, the hospitals never even looked at a Medicaid remittance advice for Medicare bad debt purposes. Never did it. Because Medicaid was on the hook for the full amount. It was non-ceiling. There was no benefit, there was no practical need to look at those remittance advice. Then all of a sudden, the state said, it's not going to pay. Medicare says, we think your remittance advices are wrong. And this is all going on in real time. And then all of a sudden, the states come to realize, excuse me, the hospitals come to realize, oh my goodness, now these remittance advice, we need to start looking at these things, which they never had to look at in the past. And they went to the Court of Appeals in the Ninth Circuit twice and won, saying that the state was, in fact, responsible to pay. So this was not hospitals like in Maine Medical, who were confused and didn't know what to do, sat on their rights. These were hospitals that were actively engaged in litigation with a state that was not only refusing to pay what it was required to under the Medicaid program, but issuing remittance advice. But I think Judge Millett asked you. I mean, that's interesting and helpful to understand. But she asked you a very focused question. Once you realize something in 97, you had a problem with crossover and there were claims that you needed to capture. Right. Why didn't you do something then and submit those claims? They did. The hospitals here went out and hired a contractor. Oh no, why didn't you submit those claims? They did submit the claims. They submitted the claims. And got determinations? I'm totally missing. Where in the J.A. will we see those claims that they submitted? That were submitted. Well, presumably those claims... Don't presume anything. You said they submitted claims. Where would we find those claims? I don't have that site, Your Honor. You said there wasn't an attachment to your letter. And where else? Well, that's the whole... I mean, it's not the whole case, but that's a crucial part of your case. And I'm perplexed that you're perplexed, because that means I don't understand this case. Well, you either submitted these claims somewhere or you didn't. And Judge Millett started by asking you, all right, once you found out there was a crossover problem and you were missing some claims... Correct. Why didn't you pull them out and submit them? And now you're saying you did? And where? Well, if I could, if I could... No, just give us a citation. No, no, no. The claims that would have been submitted would have been processed and paid under the normal course. That wasn't what you were asked. Yeah, and that... The ones that we're talking about. Those would have been paid... What do you think we're asking you? Judge Sentelle, the secretary's decision here was not based on... That's not what we're asking you. We're asking you if you submitted those claims, where would we find the evidence of the claims that were submitted? I don't know. I don't know the answer. They were submitted to Medicare. You understand we have to operate from the record we have. Oh, yeah, but the record of this case is that the hospitals, and this was their testimony, went to Medicaid and said, you've missed a number of claims. Right. They said, don't bother us with the claims. Right. And that was late. Right. That was late. And what Judge Millett says, but you had a period between 97 and 99 when you sent the letter without any attachments. In 99, well, they started prospectively submitting claims because they didn't know what hadn't made it through the crossover process. That's when they started doing it on a prospective basis. But, Your Honor, I must take you back. There's no reason it would have to be prospective. At that point, you could go, shoot, we better be careful here and submit everything since this whole thing went haywire in 94, right? I guess that's possible, but it was only a small percentage of these claims, and they didn't know at that point which claims had been missed until they got the listing from this resolution. But the point here, Your Honor. If we can just sum up real quickly here because we... I'm sorry? Just sum up real quickly here. The point here is the Secretary's decision itself was not based on the hospital's failure to bill. There is nothing in the decision that bases the decision on the failure to bill. And at most, she said, only some claims didn't cross over. It was based on there not being proper documentation of payment, and that documentation here is not disputed, and the Secretary has no right to violate the Anti-Cross Subsidization Statute. Thank you. Thank you, Your Honor. Claims submitted. The case is submitted.
judges: Millett, Edwards, Sentelle